ALLEN MATKINS LECK GAMBLE
   MALLORY & NATSIS LLP
DAVID R. ZARO (BAR NO. 124334)
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone:  (213) 622-5555
Fax:  (213) 620-8816
E-Mail:  dzaro@allenmatkins.com

ALLEN MATKINS LECK GAMBLE
   MALLORY & NATSIS LLP
EDWARD G. FATES (BAR NO. 227809)
One America Plaza
600 West Broadway, 27th Floor
San Diego, California 92101-0903
Phone:  (619) 233-1155
Fax:  (619) 233-1158
E-Mail:  tfates@allenmatkins.com

Attorneys for Receiver
THOMAS HEBRANK

1
2
3
4
5
6
7
8
9
10
11

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

12
13
14

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.  **18MC0246** |
| Plaintiff, | **NOTICE OF RECEIVERSHIP FILED PURSUANT TO 28 U.S.C. SECTION 754** |
| v. | Central District of California Case No. 2:15-cv-02563-FMO (FFMx) |
| PACIFIC WEST CAPITAL GROUP, INC.; ANDREW B CALHOUN IV; PWCG TRUST; BRENDA CHRISTINE BARRY; BAK WEST, INC.; ANDREW B CALHOUN JR.; ERIC CHRISTOPHER CANNON; CENTURY POINT, LLC; MICHAEL WAYNE DOTTA; and CALEB AUSTIN MOODY (dba SKY STONE), | |
| Defendants. | |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   **TO THIS HONORABLE COURT, ALL INTERESTED PARTIES AND**

2   **THEIR COUNSEL OF RECORD:**

3       **PLEASE TAKE NOTICE** that on April 7, 2015, the Securities and

4   Exchange Commission ("Commission") filed a securities enforcement action in the

5   United States District Court, Central District of California ("District Court") against

6   various parties in the matter styled *Securities and Exchange Commission v. Pacific*

7   *West Capital Group, Inc., et al.*, Case No. 2:15-cv-02563-FMO (FFMx) ("SEC

8   Action").  A true and correct copy of the Complaint filed in the SEC Action is

9   attached hereto as Exhibit A.

10       On February 16, 2018, pursuant to a Judgment as to Defendant PWCG Trust

11   [Appointment of Receiver] ("Appointment Order"), the District Court appointed

12   Thomas Hebrank ("Receiver") the permanent receiver for Defendant PWCG Trust.

13   A true and correct copy of the Appointment Order is attached hereto as Exhibit B.

14       In accordance with the terms of his appointment, the Receiver hereby files

15   this Notice of Receivership pursuant to 28 U.S.C. section 754 to provide notice of

16   the SEC Action, the Appointment Order, and his appointment as permanent receiver

17   for PWCG Trust.

18

19   Dated:  February 26, 2018         ALLEN MATKINS LECK GAMBLE
                                         MALLORY & NATSIS LLP
20

21                       By:      */s/ Edward Fates*

22                          EDWARD G. FATES
                                         Attorneys for Receiver
                                         THOMAS HEBRANK

23

24

25

26

27

28

# EXHIBIT A

JOHN B. BULGOZDY (Cal. Bar No. 219897)
Email: bulgozdyj@sec.gov
KRISTIN S. ESCALANTE (Cal. Bar No. 169635)
Email: escalantek@sec.gov
KELLY C. BOWERS (Cal. Bar No. 164007)
Email: bowersk@sec.gov
TODD BRILLIANT (Cal Bar No. 147727)
Email: brilliantt@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Lorraine Echavarria, Associate Regional Director
John W. Berry, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Western Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>PACIFIC WEST CAPITAL GROUP, INC.; ANDREW B CALHOUN IV; PWCG TRUST; BRENDA CHRISTINE BARRY; BAK WEST, INC.; ANDREW B CALHOUN JR.; ERIC CHRISTOPHER CANNON; CENTURY POINT, LLC; MICHAEL WAYNE DOTTA; and CALEB AUSTIN MOODY (dba SKY STONE),<br><br>Defendants. | Case No.: 2:15-cv-02563<br><br>**COMPLAINT** |

COMPLAINT                                          1

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a). because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

1.      This case involves fraud in the unregistered offer and sale of securities consisting of fractionalized interests in universal life insurance policies, or "life settlements," by Defendants Pacific West Capital Group, Inc. ("Pacific West") and Andrew B Calhoun IV ("Calhoun").  Pacific West and Calhoun sell investments structured around when life insurance policies "mature" (the insured individual dies) and the benefits are paid.  Since Calhoun started Pacific West in 2004, they have raised approximately $99.9 million from over 3,200 investors who purchased life settlements in approximately 125 life insurance policies.  Since at least 2012, Pacific West and Calhoun have perpetrated a scheme to defraud investors by using money received from investors from the sale of new life settlements to pay premiums on life settlement investments sold years earlier which had not matured and had exhausted the "premium reserves" created by Pacific West and Calhoun to keep the policies in force.  Pacific West and Calhoun engaged in this conduct to create the false appearance that the life settlements they structured and sold had minimal risk and would pay off within the expected period.

2.      In addition, since at least 2012, Pacific West and Calhoun have

COMPLAINT                                    2

1  misrepresented the risks that investors would have to make future, out-of-pocket

2  payments to keep the policies in force, and failed to disclose material information

3  about the increased amount of future premiums.  Pacific West and Calhoun have also

4  misled investors about their likely annual returns and falsely represented to investors

5  that their investments had nothing to do with Pacific West's efforts and fortunes.  By

6  engaging in this conduct, Pacific West and Calhoun facilitated their sale of new life

7  settlements to unsuspecting investors, which generated substantial revenue for Pacific

8  West and Calhoun.  Pacific West and Calhoun retained the "Sales Agent Defendants"

9  (collectively, Defendants Brenda Barry; BAK West, Inc.; Andrew B. Calhoun Jr.;

10  Eric Cannon; Century Point, LLC; Michael Dotta; and Caleb Moody) to offer and sell

11  the life settlements to investors.

12       3.     The securitized life settlements are issued by Defendant PWCG Trust

13  ("Trust"), and the offer and sale of these investments by Pacific West and Calhoun

14  are not registered and have been, and are being, offered and sold in violation of the

15  registration provisions of the federal securities laws by Pacific West, Calhoun, Trust,

16  and the Sales Agent Defendants.  Defendants Pacific West, Calhoun, and the Sales

17  Agent Defendants have been, and are, operating as unregistered brokers and dealers

18  in the offer and sale of life settlements in violation of the broker-dealer registration

19  provisions of the federal securities laws.

20       4.     Upon information and belief, the defendants' fraudulent conduct and

21  unregistered offering is continuing, as are their violations of the broker-dealer

22  registration provisions.

23       5.     With this Complaint, the SEC seeks permanent injunctive relief against

24  Pacific West and Calhoun from violations of the antifraud provisions of the federal

25  securities laws, disgorgement of ill-gotten gains with prejudgment interest thereon,

26  and civil penalties.  In addition, the SEC seeks permanent injunctive relief against

27  Pacific West, Calhoun, the Trust, and the Sales Agent Defendants, from violations of

28  the registration provisions of the federal securities laws, disgorgement of ill-gotten

COMPLAINT                                    3

1  gains with prejudgment interest thereon, and civil penalties.  Finally, the SEC seeks

2  permanent injunctive relief against Pacific West, Calhoun, and the Sales Agent

3  Defendants, from violations of the broker-dealer registration provisions of the federal

4  securities laws, disgorgement of ill-gotten gains with prejudgment interest thereon,

5  and civil penalties.

**DEFENDANTS**

6.     **Pacific West Capital Group, Inc.** ("Pacific West") is a privately-held

7  California corporation formed in 2004 with its principal place of business in Los

8  Angeles, California.  Pacific West is not registered with the Commission in any

9  capacity.

10

11     7.     **Andrew B Calhoun IV** ("Calhoun") resides in Beverly Hills, California.

12 He is the founder, sole owner, and president of Pacific West.  Calhoun graduated

13 from the University of North Carolina, Chapel Hill, in 1992 with a degree in business

14 administration.  Calhoun has been licensed in California as a life insurance agent

15 since 2003.  Calhoun has never been registered with the Commission in any capacity

16 or held any securities licenses.

17     8.     **PWCG Trust** ("Trust") is an Ohio business trust formed in 2004.  The

18 Trust purchases life insurance policies in its name as instructed by Pacific West and

19 issues interests in those policies to investors solicited by Pacific West.  The Trust

20 (through its trustee) also maintains a bank account which holds premium reserves and

21 maintains books and records accounting for those different reserves.

22     9.     **Brenda Christine Barry** ("Barry") resides in Issaquah, Washington.

23 Barry has been a sales agent with Pacific West since 2004.  Barry has been licensed

24 in California as a life insurance agent since 2004.  Barry has never been registered

25 with the Commission in any capacity or held any securities licenses.

26     10.    **BAK West, Inc.** ("BAK West") was a California corporation formed by

27 Barry in 2005.  Since at least August 2010, Pacific West has paid Barry's

28 commissions to BAK West.  In 2011, BAK West's corporate status was suspended by

COMPLAINT                                    4

California.  BAK West has never been registered with the Commission in any capacity.

11.   **Andrew B Calhoun Jr.** ("Calhoun Jr.") resides in Anderson, South Carolina, and is Calhoun's father.  Calhoun Jr. has been a sales agent with Pacific West since 2006.  Calhoun Jr. has been licensed in California as a life insurance agent since 2006.  Calhoun Jr. has never been registered with the Commission in any capacity or held any securities licenses.

12.   **Eric Christopher Cannon** ("Cannon") resides in Lakewood, California.  Cannon has been a sales agent with Pacific West since September 2010.  Cannon graduated from the University of Southern California in 1993 with a degree in business administration.  Cannon has been licensed in California as a life insurance agent since 2011.  Cannon has never been registered with the Commission in any capacity, but he has held securities licenses and was associated with various registered broker-dealers from 1993 to 2006.

13.   **Century Point, LLC,** ("Century Point") is an Arizona company formed in September 2011.  Since February 2012, Pacific West has paid Cannon's commissions to Century Point.  Century Point has never been registered with the Commission in any capacity.

14.   **Michael Wayne Dotta** ("Dotta") resides in Los Angeles, California.  Dotta has been a sales agent with Pacific West since September 2011.  Dotta graduated from Pennsylvania State University in 1999 with a bachelor of arts degree.  Dotta has been licensed in California as a life insurance agent since 2010.  Dotta has never been registered with the Commission in any capacity or held any securities licenses.

15.   **Caleb Austin Moody, dba Sky Stone** ("Moody"), resides in Los Angeles, California.  He has been a sales agent with Pacific West since approximately June 2012.  Moody graduated from Texas Christian University in 1999 with a bachelor of fine arts degree.  Since August 2013, Pacific West has paid Moody

COMPLAINT                                             5

1  his commissions in the fictitious business name "Sky Stone."  Moody has been

2  licensed in California as a life insurance agent since 2012.  Moody has never been

3  registered with the Commission in any capacity or held any securities licenses.

4  **ALLEGATIONS**

5  **A.**    **Pacific West's Offer and Sale of Life Settlements**

6         16.    Pacific West and Calhoun offered and arranged the sale of life

7  settlements to investors, which are fractional interests in universal life insurance

8  policies.  In the life settlements offered and sold by Pacific West and Calhoun,

9  investors' money was pooled to buy a particular insurance policy on the life of a

10  person (the "Insured").  Pacific West represented to investors that they offer and sell

11  policies that they expect will mature in four to seven years, and pay a total return to

12  the investor of at least 100% to 150%.

13         17.    To pay the premiums necessary to keep a policy in force, Pacific West

14  represented to investors that it created three levels of "reserves" (a "Primary,"

15  "Secondary," and "Tertiary Premium Reserve") to pay premiums during a six to nine

16  year period, set by Calhoun (the "Contract Period"), during which time a policy was

17  expected to mature.

18         18.    Calhoun and Pacific West determined the length of the Contract Period

19  and the amount of investors' funds that was allocated to the Primary Premium

20  Reserve for each policy.

21         19.    While Pacific West and Calhoun told investors that they would be liable

22  for their pro rata share of any premium payments if the three levels of reserves ran

23  out (a "premium cash call"), at the same time Pacific West and Calhoun also told

24  investors that they had never touched the Secondary or Tertiary Premium Reserves

25  and had never made a premium call to investors.  Pacific West and Calhoun did not

26  disclose the actual amount of any pro rata premiums that would be owed if the

27  reserves ran out and there was a premium call.

28         20.    Pacific West and Calhoun also told investors that the success of their life

COMPLAINT                                           6

1   settlements was independent of Pacific West, and represented that Pacific West had
2   no involvement after a policy was purchased.

3        21.    As compensation for offering and selling the life settlements, Calhoun
4   and Pacific West allocated about 45% of the funds raised from investors to Pacific
5   West as its "margin."  Pacific West and Calhoun did not disclose to investors that
6   they were realizing a 45% margin on the life settlements.

7        22.    Pacific West and Calhoun effected the sales using a Life Settlement
8   Purchase Agreement ("Purchase Agreement") between the investor and Pacific West,
9   and a Life Settlement Disclosure Form ("Disclosure Form") signed by the investor.
10  The investors deposited their funds in escrow with the Trust, received the Purchase
11  Agreement and Disclosure Form from Pacific West, and had seven days to rescind.
12  Pacific West and Calhoun directed the Trust to purchase policies using the investors'
13  funds, book a certain amount of reserve to pay the policies' premiums, and make the
14  "margin" payments to Pacific West.  The Trust purchased the policies, and
15  maintained accounts for the premium reserves.  Under the terms of the agreement
16  with the Trust, the Trust informed Pacific West and Calhoun when the primary
17  reserve for a particular policy was depleted.  The Trust ultimately collected the death
18  benefit when the policies matured and distributed a pro rata share of the death
19  benefits to the life settlement investors.

20       23.    Calhoun controls Pacific West, and controlled all aspects of the process
21  of its offer and sale of life settlements, including identifying life insurance policies to
22  be offered, determining the amount of the Primary Premium Reserve by setting the
23  Contract Period and the premiums paid during that period, directing the Trust to use
24  money from the sale of new life settlements to pay premiums on older policies with
25  depleted Primary Premium Reserves, and controlling the information provided to
26  investors through the Sales Agent Defendants.  Until in or around March 2014,
27  Calhoun had not disclosed to the Sales Agent Defendants that he was using the
28  proceeds from the sale of new life settlements to pay premiums on older policies that

COMPLAINT                                    7

1   had depleted their Primary Premium Reserve.

2       24.    Pacific West and Calhoun have raised substantial funds from investors

3   through the unregistered offer and sale of securities.  From late 2004 through at least

4   November 2014, Pacific West and Calhoun raised more than $99.9 million from over

5   3,200 investors who had purchased interests in approximately 125 policies.  During

6   that period, approximately $45.9 million, or about 46% of the total amount raised

7   from investors, was paid to Pacific West as its self-described "margin."

8       25.    For the period beginning January 2012 through at least November 2014,

9   Pacific West and Calhoun raised approximately $37.3 million from investors.  Of that

10   amount, just over 15%, or about $5.7 million, was used to purchase policies, and just

11   less than 34%, or about $12.6 million, was used to fund the Primary Premium

12   Reserve.  About 4%, or over $1.5 million, was used to pay broker commissions and

13   escrow fees.  Pacific West directed the Trust to pay it over $17.2 million, or over

14   46% of the total amount raised from investors, as its margin during this period.

15       26.    Of the $17.2 million that Pacific West received from January 2012

16   through November 2014, Calhoun personally received approximately $5.2 million –

17   or about 13% of the total amount raised from investors – in salary, commissions, and

18   transfers.  Another $2.3 million of Pacific West's margin was paid to the Sales Agent

19   Defendants as commissions during this period.  Finally, approximately $1.9 million

20   of Pacific West's margin was used to pay premiums on older policies that had

21   depleted Primary Premium Reserves – or about 5% of all investor funds raised from

22   January 2012 through November 2014.

23       **1.**    **Calhoun selected the policies to be offered to investors**

24       27.    Pacific West and Calhoun sold fractionalized interests in a type of life

25   insurance policy called "universal life" or "flexible premium adjustable life"

26   insurance.  These types of policies have an insurance component like a term life

27   insurance policy, and a savings component like a whole life insurance policy.  The

28   cost of the insurance component generally increases each year.  The policyholder can

COMPLAINT              8

1  determine the amount of premium that they wish to pay annually, but to keep the

2  policy in force a policyholder must pay an amount equal to the insurance component.

3  A universal life insurance policyholder may use a policy's accumulated cash value, if

4  any, to subsidize and decrease the amount needed to be paid each year to keep the

5  policy in force, which has the effect of depleting the cash value of the policy. Once

6  the cash value reaches zero, it may no longer be used to subsidize annual payments to

7  keep a policy in force.

8       28.    Calhoun personally selected each of the policies that Pacific West

9  offered and sold to investors as life settlements.

10      29.    Pacific West and Calhoun represented to investors that Pacific West

11  selects only policies that are non-contestable, have been issued by A-rated life

12  insurance companies, and are on Insureds who are of "advanced ages and/or who

13  typically experience chronic or degenerative health conditions." Pacific West and

14  Calhoun, directly and through their sales agents, also represented to investors that

15  Pacific West selects and offers policies that "typically," or they "estimate," "feel," or

16  "target," will mature in four to seven years.

17      30.    In fact, Pacific West and Calhoun have no reasonable basis for their

18  representations that the policies Calhoun selects are estimated or targeted to mature in

19  four to seven years. Although Calhoun received some life expectancy reports from

20  third parties, he claims not to have relied on any actuarial information to select the

21  policies. Instead, Calhoun, who is not an actuary or medical doctor, selected policies

22  based on his judgment and estimates. In a life settlement transaction, an actuarial-

23  based estimate of an Insured's life expectancy is a critical factor in determining the

24  present value of the policy and making a reasoned estimate of any premium reserve.

25      31.    While Calhoun reviewed information about an Insured when selecting a

26  policy, Calhoun's selection of a policy depended largely on the premium cost to keep

27  the policy in force. To determine that amount, Calhoun set a Contract Period based

28  upon the Insured's age, health, and family history, and then calculated the amount

COMPLAINT                                    9

1   necessary to keep a policy in force during the Contract Period while using up the cash

2   value of a policy.  Calhoun then used this calculation to set the amount of the Primary

3   Premium Reserve.  In general, at the end of the Contract Period, the cash value of the

4   policy sold by Pacific West was depleted.  Calhoun and Pacific West generally used a

5   Contract Period of six to nine years.

6          32.    Since 2011, in connection with the selection and purchase of five

7   policies, the insurance broker offering the policy provided Pacific West and Calhoun

8   with life expectancy reports prepared by third parties as part of a package of materials

9   provided to prospective buyers.  According to Calhoun, he never used actuarial charts

10  or looked at life expectancies in selecting policies.  But, the estimated life

11  expectancies of the insureds in the five reports provided to Pacific West and Calhoun

12  were years longer than Contract Periods set by Calhoun for the corresponding life

13  settlements offered and sold by Pacific West.

14          **2.     Pacific West and Calhoun represented to investors that they have**

15                  **three levels of reserves available to pay premiums**

16          33.    Pacific West and Calhoun represented in sales materials and

17  presentations to investors that three levels of premium reserves protected the

18  investors' investment:  (i) a "Primary Premium Reserve" which was to contain

19  sufficient funds to pay premiums for a policy during the entire Contract Period,

20  funded from the proceeds of the sale of the fractional interests in the specific

21  underlying life insurance policy; (ii) a "Secondary Premium Reserve" which was a

22  general reserve available for all policies sold by Pacific West that was funded by 1%

23  of all investment proceeds from all life settlements sold by Pacific West; and (iii) a

24  "Tertiary Premium Reserve" which was a general reserve available for all policies

25  sold by Pacific West and was funded by any unused Primary Premium Reserves

26  remaining on policies that mature before those primary reserves are depleted.

27          34.    Calhoun was personally responsible for determining the method used by

28  Pacific West to set the amount of the "Primary Premium Reserves" for each life

COMPLAINT                              10

1   settlement offered and sold by Pacific West.

2        35.    One of the selling points to potential investors used by Pacific West and

3   Calhoun was the existence of the Secondary Premium Reserve and Tertiary Premium

4   Reserve.  Pacific West and Calhoun, directly and indirectly through sales agents,

5   informed investors that they have never used funds from either the Secondary

6   Premium Reserve or the Tertiary Premium Reserve.  Pacific West and Calhoun also

7   represented, directly and indirectly through sales agents, to investors that they never

8   had to make a cash premium call, that is, to ask investors to make a cash payment to

9   pay their pro rata share of any premiums to keep a policy in force, beyond the initial

10  investment.

11       **3.    Pacific West and Calhoun solicited investors using means of**

12           **interstate commerce**

13       36.    Pacific West and Calhoun solicited prospective investors through radio,

14  television, and internet advertising, and through mass mailings inviting individuals to

15  attend seminars.  Pacific West maintained a website, pwcapital.net, which offered

16  information about life settlements and provided contact information for Pacific West.

17       37.    The Sales Agent Defendants and Calhoun received calls from

18  prospective investors, made presentations at Pacific West's seminars, arranged for

19  investors to receive life settlement investment closing documents, and sold life

20  settlements to investors.

21       38.    Calhoun trained, supervised, and provided to the Sales Agent Defendants

22  information about Pacific West's business and life settlements being offered.

23       39.    Pacific West and Calhoun paid the Sales Agent Defendants an 8%

24  commission on sales of life settlements.

25       40.    The Sales Agent Defendants also worked with outside sales persons, and

26  the Sales Agent Defendants received a 2% override commission of the amounts

27  raised from investors by the outside sales representatives.

28

COMPLAINT                                11

**4.     Pacific West and Calhoun offered investors a "total fixed return" of at least 100% to 150%**

41.     In their brochure offering life settlements, Pacific West and Calhoun offered "total fixed returns" of between 100% and 150%.

42.     In one of their sales brochures, Pacific West and Calhoun showed how an investor who made a $100,000 investment for a "100% total fixed return" would receive a payment when the policy matured of $200,000.  Pacific West and Calhoun also provided examples showing a "simple annual rate" of between 100% if the policy matured in one year, which decreased to a 20% annual return if the policy matured in 5 years, and decreased to 10% annual return if a policy matured in ten years.

**5.     Pacific West's sales process**

43.     When an investor decided to purchase a fractionalized interest in a policy from Pacific West, the investor was instructed to deposit money in escrow with the Trust.

44.     After an investor deposited funds with the Trust, Pacific West and Calhoun disclosed specific information about the policy and transaction in a nine-page Purchase Agreement between Pacific West as seller and the investor as purchaser, and a three-page Disclosure Form.

45.     The Purchase Agreement represented that Pacific West "has established a five (5) level plan in order to provide that premium payments are made until the date of maturity of the [underlying life insurance] policy."   One of those five levels of reserves was a "disability rider" that did not have a practical effect on any policies sold by Pacific West.  Three of the levels were the Primary, Secondary, and Tertiary Premium Reserves.  The fifth level was a premium call to investors in a particular life settlement investment, in which investors would have to pay their pro rata share of a premium to keep a policy in force.

46.     The investor then had seven days after receipt of the Purchase

COMPLAINT                                         12

Agreement and Disclosure Form to rescind their investment.

**6.      The Trust's role**

47.      Pacific West and Calhoun entered into a Trust Agreement dated November 9, 2004 ("2004 Trust Agreement"), and an Amended and Restated Trust Agreement dated April 29, 2011 ("2011 Trust Agreement"), with the trustee of the Trust.

48.      The 2004 Trust Agreement and the 2011 Trust Agreement each provided, among other things, that Pacific West will direct the payment by the trustee from the Premium Account of all premiums required to keep the policies in force and to prevent the policies from lapsing or terminating.  The 2004 Trust Agreement and the 2011 Trust Agreement also provided that in the event the funds on deposit in the Premium Account for a given policy are insufficient to pay a premium that is due, then the trustee shall notify Pacific West, which then has the option to deposit funds in the Premium Account sufficient to satisfy the deficiency, or instruct the trustee not to make the payment if there is sufficient cash value in the policy, or instruct the trustee to make a cash call to investors for funds sufficient to pay the premium due on the policy.

49.      The 2004 Trust Agreement and 2011 Trust Agreement were not part of the offering materials distributed by Pacific West.  In general, the 2004 Trust Agreement and the 2011 Trust Agreement were not provided to potential investors.

50.      As instructed by Pacific West and Calhoun, the Trust issued interests in a policy or fractional shares in a policy to investors.

51.      The Trust maintained a single bank account in which the Primary, Secondary, and Tertiary Premium Reserves were commingled and maintained for all life settlements offered and sold by Pacific West.

52.      The Trust maintained a ledger showing the amounts in the Primary, Secondary, and Tertiary Reserves.

COMPLAINT                                        13

**7.  Pacific West and Calhoun have a continuing role in the success of the life settlements**

53.  Once Pacific West and Calhoun raised enough money from investors to purchase a policy, but in some cases before they raised sufficient money to completely fund the Primary Premium Reserve, Pacific West and Calhoun instructed the Trust to purchase a policy, allocate funds to the Primary and Secondary Premium Reserves as available, and pay some portion of the investors' funds to Pacific West as its margin.  The Trust recorded a receivable in the full amount of the Primary Premium Reserve based on Calhoun's calculation, and the Secondary Premium Reserve based on a percentage of the funds raised.  If all the interests in the life settlement have been sold, the Trust then recorded the receipt of cash which is deposited into the single bank account that holds all of the reserve funds.

54.  In some instances, Pacific West and Calhoun instructed the Trust to purchase a policy before they sold all of the fractional interests to investors.  In such cases, the premium receivable booked by the Trust remained outstanding.  Pacific West and Calhoun continued to offer interests in the policy to investors, and as funds were received, Pacific West and Calhoun instructed the Trust on the amount of new investor funds that should be booked to pay down the outstanding Primary Premium Reserve receivable, and the amount to be disbursed to Pacific West as its margin.  In these instances, the investors were dependent on Pacific West's and Calhoun's ability to sell the remaining interests in the policy to generate sufficient money to fund the Primary Premium Reserve.  In some cases, Pacific West directed payments of new investor cash to itself even while the Primary Premium Reserve was not fully funded.

**8.  The life settlements offered and sold by Defendants are securities**

55.  The life settlements offered and sold by Defendants are securities.  The investors' funds are pooled for the purposes of purchasing the policies underlying the life settlements.  Pacific West and Calhoun selected the policies to be purchased with the money raised from investors, and negotiated the purchase prices for those

COMPLAINT                                        14

1  policies.  The Trust also assumed the responsibility of making premium payments for

2  the life settlements.

3       56.     The returns paid to investors depend in significant part upon the ability

4  of Pacific West and Calhoun to estimate a reasonably accurate Contract Period and

5  calculate a sufficient Primary Premium Reserve.  If they underestimated the length of

6  the Contract Period, then the chances increased that the investors would realize

7  substantially lower net and annual returns.

8       57.     Pacific West and Calhoun also set up the reserve structure to pay the

9  premiums on the underlying policies.  They determined how much money should be

10  placed in these reserves, and they determined how much of the reserves should be

11  used to pay the policy premiums.  For example, the Secondary Premium Reserves are

12  funded with 1% of all sales, and that percentage was set by Pacific West and

13  Calhoun.  In addition, Pacific West sometimes retains fractional interests in some of

14  the policies sold to investors.

15       58.     Finally, beginning in 2012, Pacific West used a substantial portion of the

16  funds it received from the sale of new life settlements to pay premiums on older

17  policies where the Primary Premium Reserves had been depleted.

18       59.     The Purchase Agreement used by Pacific West referred to the sale of

19  securities in discussing the life settlements, and brochures distributed by Pacific West

20  informed potential investors that life settlements are considered securities in

21  California.  In fact, the life settlements sold by Pacific West and Calhoun are defined

22  as "securities" under the California Corporations Code.

23       60.     The life settlements sold by Pacific West and Calhoun are a single offer

24  and sale of securities.  Pacific West and Calhoun have conducted the offering

25  continuously since 2004, have sold the same class of securities consisting of life

26  settlements, under the same general terms, and using the same basic offering

27  materials, and all sales involved cash.  One of the main selling points was the

28  existence of the Secondary Premium Reserves, which were funded by a percentage of

COMPLAINT                                    15

all life settlements sold by Pacific West, and the Tertiary Premium Reserves which were funded by any unused Primary Premium Reserves on other life settlements.

**B.     Pacific West's and Calhoun's Scheme to Defraud Investors**

61.     Beginning no later than early 2012 and continuing to at least November 2014, an increasing number of life settlements sold from 2004 through 2008 by Pacific West and Calhoun ran out of funds in their Primary Premium Reserves.  The Primary Premium Reserves were depleted because Calhoun set up a Primary Premium Reserve that was insufficient to cover premiums necessary to keep policies in force during the Contract Period, and/or because the Insureds had outlived the Contract Period.

62.     Beginning in 2012 and continuing through at least November 2014, Pacific West and Calhoun directed the Trust to use a portion of Pacific West's margin from the sale of new life settlements to pay premiums on older policies where the Primary Premium Reserve account had been depleted.  Pacific West and Calhoun did not follow the disclosed protocol of drawing funds from the Secondary and Tertiary Premium Reserves, and if those were depleted, then requiring investors to pay additional amounts consisting of their pro rata share of premiums to keep policies in force.

63.     Between January 1, 2012 and November 14, 2014, Pacific West and Calhoun directed the Trust to use approximately $1.9 million of new investor funds from the sale of life settlements during that period, to pay premiums on policies they had sold to investors between 2004 and 2008.  The $1.9 million represented approximately 5% of all funds Pacific West and Calhoun raised from investors during that period, and approximately 11% of the approximately $17.2 million that Pacific West received from the sale of life settlements during that period.

64.     By paying the premiums from the margin generated from the sale of new life settlements to investors, Pacific West and Calhoun avoided using any funds from the Secondary or Tertiary Premium Reserves, and avoided making a premium cash

COMPLAINT                                         16

1  call to any investor.  In fact, the Secondary and Tertiary Premium Reserves totaled

2  slightly over $1.1 million as of November 2014, so that the contingent reserves were

3  insufficient to pay the over $1.9 million in premiums that Pacific West and Calhoun

4  paid from new investor money.  If Pacific West and Calhoun had followed the

5  protocol disclosed to investors, the Secondary and Tertiary Premium Reserves would

6  have been completely depleted, and they would have needed to make premium calls

7  for over $780,000 to investors.  Such a course of events would have put a significant

8  damper on their sales efforts and their ability to raise money from new investors.

9        65.    During the same period, Pacific West and Calhoun, directly and through

10  the Sales Agents, told new and existing investors that it had never used any funds

11  from the Secondary or Tertiary Premium Reserves to pay premiums on any policy

12  they had sold as life settlements, and had never made a premium cash call to investors

13  for additional funds to pay premiums.  They also told investors that Pacific West

14  offered and sold life settlements on policies that they estimated would mature in four

15  to seven years, and that Pacific West did not have any continuing involvement in the

16  success of the life settlements once the policies were purchased by the Trust.

17        66.    Pacific West and Calhoun engaged in this conduct to generate additional

18  sales of life settlements by creating the false appearance that they were successfully

19  selecting policies that will mature within four to seven years, and that the life

20  settlements they sold in fact matured during the Contract Period.

21        67.    Pacific West and Calhoun engaged in this conduct to create the false

22  appearance that Pacific West was successful in estimating sufficient amounts of

23  Primary Premium Reserves, so that there was a low risk that investors would need to

24  pay additional sums as a consequence of a premium cash call and thereby realize

25  lower annual returns.

26        68.    Pacific West and Calhoun engaged in this conduct to create the false

27  appearance that Pacific West did not have a continuing involvement in the life

28  settlements after policies were purchased by the Trust, and the life settlement

COMPLAINT                                        17

1 │ investors would not be affected if Pacific West went out of business.

2 │      69.    In perpetrating this fraudulent scheme, Calhoun acted with scienter.  As

3 │ the control person of Pacific West, Calhoun's scienter is imputed to Pacific West.

4 │      70.    Through at least early 2014, Calhoun had not informed the Sales Agent

5 │ Defendants that Pacific West and Calhoun were using funds from the sale of new life

6 │ settlements to pay premiums on older policies which had depleted their Primary

7 │ Premium Reserve Account.  Calhoun disclosed this information to the Sales Agent

8 │ Defendants during the course of the SEC's investigation after some of the Sales

9 │ Agent Defendants had been subpoenaed to provide testimony.

10 │      71.    From at least early 2012 through at least March 2014, Pacific West and

11 │ Calhoun had not informed potential investors that Pacific West used money from the

12 │ sale of new life settlements to pay premiums on older policies sold from 2004 to

13 │ 2008.  Pacific West and Calhoun also failed to tell potential investors that in so doing,

14 │ Pacific West disregarded the disclosed procedure for paying premiums when the

15 │ Primary Premium Reserve had been depleted.

16 │      72.    At all relevant times, Calhoun knowingly, recklessly or negligently

17 │ perpetrated this fraudulent scheme.  As the founder, sole owner, and president of

18 │ Pacific West, Calhoun's knowledge, recklessness and negligence are imputed to

19 │ Pacific West.

20 │ **C.**    **Pacific West's and Calhoun's Materially False and Misleading Statements,**

21 │        **and Omission of Material Facts**

22 │      **1.**    **Pacific West and Calhoun misled investors about the risk of having**

23 │           **to make future, out-of-pocket, premium payments**

24 │      73.    Pacific West and Calhoun made materially false and misleading

25 │ statements, and omitted material facts, regarding the investors' risk of having to make

26 │ future, out-of-pocket, premium payments that would be substantially higher than the

27 │ premiums disclosed in the Disclosure Form.  Pacific West and Calhoun knew, or

28 │ were reckless or negligent in not knowing, that these material misstatements and

COMPLAINT             18

1 | omissions were false when made.

2 |     74.   In the Disclosure Form, Pacific West and Calhoun stated the annual

3 | premium amount, the premium due date, and the Contract Period covered by the

4 | Primary Premium Reserve. Pacific West's Purchase Agreement and Disclosure Form

5 | stated that if the reserves were exhausted, then investors were liable for their pro rata

6 | share of premiums needed to keep a policy in force.

7 |     75.   These disclosures were misleading because they omitted material

8 | information that if there was a premium call, the premiums would be substantially

9 | higher than the premium amount disclosed in the Disclosure Form. The premiums

10 | would be substantially higher because the premiums necessary to keep the policies in

11 | force increase substantially over time; and Pacific West and Calhoun used up any

12 | cash value in the policies to subsidize the disclosed premium amount.

13 |     76.   Calhoun and Pacific West knew, or were reckless or negligent in not

14 | knowing, that premiums would spike at the end of the Contract Period. If an investor

15 | were required to pay pro rata shares of a substantially higher premium, then that

16 | would negatively impact the investor's returns. Pacific West and Calhoun generally

17 | did not disclose the premium spike, the amount of the spike, or the reasons for the

18 | spike.

19 |     77.   Pacific West and Calhoun also misled investors by omitting material

20 | information about the likelihood that investors will have to meet a premium cash call.

21 | Pacific West and Calhoun, directly and through the Sales Agent Defendants,

22 | represented to investors that the Secondary and Tertiary Premium Reserves had never

23 | been used to pay policy premiums. Pacific West and Calhoun failed to disclose

24 | material information that the reason that the Secondary and Tertiary Premium

25 | Reserves had not been used was because Pacific West and Calhoun were using funds

26 | from the sale of new life settlements to pay premiums on older policies.

27 |     78.   When a potential investor asked about the likelihood of a premium call,

28 | Pacific West, directly and through the Sales Agent Defendants, stated that the

COMPLAINT           19

1   Secondary and Tertiary Premium Reserves had never been touched.  In general,
2   Pacific West refused to disclose the amount in those reserves, and refused to disclose
3   the number of life settlements that had not paid off during the Contract Period.

4       79.   Information about the risks relating to the amount and likelihood of a
5   premium call was material to investors because, among other reasons, it could
6   significantly impact the returns the investors received on their investments in the life
7   settlements.

8       **2.**   **Pacific West and Calhoun made misleading statements and omitted**
9               **material information about the investors' annual returns and the**
10              **maturity of the policies**

11      80.   Pacific West and Calhoun made misleading statements and omissions to
12  investors about the investors' annual returns and the maturity of the policies that they
13  offered and sold.  Pacific West and Calhoun knew, or were reckless or negligent in
14  not knowing, that these material misstatements and omissions were false and
15  misleading when made.

16      81.   Pacific West, through Calhoun and the Sale Agent Defendants,
17  represented to potential investors orally and through emails that Pacific West selected
18  policies that "typically," or it "estimate[s]," "feel[s]," or "target[s]" will mature (e.g.,
19  pay a death benefit) in four to seven years.  Pacific West and Calhoun omitted
20  material information that they had no reasonable basis to make those representations,
21  because they did not rely on life expectancies or other actuarial data in selecting
22  policies or setting Contract Periods.

23      82.   Pacific West, through Calhoun and the Sales Agent Defendants,
24  represented that Secondary and Tertiary Premium Reserves had never been drawn on
25  to make premium payments, which while true, omitted material information that the
26  reserves had not been used only because Calhoun was using money from the sale of
27  new life settlements to pay premiums on older policies to create the façade that he
28  never had to touch the reserves.

COMPLAINT                                     20

83.     Beginning in early 2012, these representations were also misleading because they omitted material information that only a small percentage of the life settlements sold matured with seven years.  As of November 2014, just 7.6% of the life settlements sold during 2004 and 2007, representing just over 6% of the total face value, matured within seven years.

84.     Information that Pacific West and Calhoun were using new investor proceeds to pay premiums on older policies was material to their statements that they had not used reserves to make premium payments.  Information about the accuracy of the estimates of when a policy would mature was material to investors because it could significantly affect the length of time until an investor received a return, the net annual return, the cost of the investment, and the risk that the life settlement would expire before the policy paid a death benefit.

**3.     Pacific West and Calhoun omitted material information relating to Pacific West's role in the life settlements**

85.     Pacific West and Calhoun falsely represented that the success of an investment in a life settlement was completely independent of Pacific West's efforts or fortunes, and omitted material information regarding their continuing role in the success of the life settlements they offered and sold.  Pacific West and Calhoun knew, or were reckless or negligent in not knowing, that these misrepresentations and omissions were false and misleading when made.

86.     Pacific West's Purchase Agreement stated "that the economic benefit derived from the transaction(s) contemplated by this Agreement will result solely from the maturity of the life insurance policy(ies) upon the death of the insured(s), and will not be derived from the efforts of any person or entity employed by or associated with" Pacific West.

87.     Pacific West represented to investors in at least one sales brochure that the life settlements are "independent" of Pacific West, that the "prosperity" of Pacific West "does not affect you at all," and that "your investment is implemented before

COMPLAINT                                21

1    distributions are made to us."

2        88.    The statements were false and misleading because the investors'

3    economic benefit is dependent upon Calhoun's and Pacific West's ability accurately

4    to estimate a Contract Period and a sufficient Primary Premium Reserve.

5        89.    The statements were false and misleading, and omitted material facts,

6    because the investors' economic benefit depends on Pacific West's ability to raise

7    new investor funds and its willingness to use a portion of those funds to pay the

8    Trust's fees and premiums on policies where the Primary Premium Reserve is

9    depleted.  In fact, Pacific West has paid the Trust's fees and expenses, and used

10   approximately $1.9 million to pay premiums on older policies.  If Pacific West went

11   out of business, then investors would have to pay these fees and premiums which

12   would negatively affect the investors' returns.

13       90.    The statements were also false and misleading, and omitted material

14   facts, for those policies where Pacific West and Calhoun had paid themselves

15   distributions before fully funding the reserves.  In certain instances, Pacific West and

16   Calhoun instructed the Trust to purchase policies before Pacific West raised sufficient

17   funds from investors to fund fully the Primary Premium Reserve.  As of November

18   2014, the books and records of the Trust showed that the Primary Premium Reserve

19   for life settlements sold by Pacific West was owed approximately $1.1 million to

20   satisfy unfunded reserves.  At the same time that Calhoun and Pacific West allowed

21   these Primary Premium Reserve receivables to remain unfunded, Calhoun caused

22   Pacific West to be paid over $3.7 million in connection with the sales of life

23   settlements in the policies with unfunded Primary Premium Reserves.  As a

24   consequence of this conduct, Pacific West's representations to investors that

25   investments were "implemented before distributions are made to us" was false.

26       91.    Information concerning risks relating to Pacific West's continuing role

27   in the life settlements, and the effect of Pacific West's going out of business, was

28   material to investors, and in fact, investors asked for this information.  In response to

COMPLAINT                          22

1   such inquiries, Pacific West reassured potential investors that its going out of

2   business would have no effect because the life settlements and policies and premium

3   reserves were held by the Trust.

4         92.    At all relevant times with regard to the above-alleged false and

5   misleading statements, and omissions of material fact, Calhoun acted with

6   knowledge, recklessness or negligence.  Calhoun's knowledge, recklessness and

7   negligence are imputed to Pacific West.

8   **D.    The Defendants' Unregistered Offer and Sale of Securities**

9         93.    The life settlements offered and sold by Defendants beginning in 2004

10   and continuing to the present, and issued by the Trust, are a single offering of

11   securities.

12        94.    Defendants used means and instrumentalities of interstate commerce to

13   effect the offer, sale, and issuance of the life settlements.  Pacific West and Calhoun

14   advertised using radio, television, and internet advertising, and documents were sent

15   through the mails and using the internet.  Pacific West and Calhoun are located in

16   California, and the Trust is an Ohio business with its principal place of business in

17   Cleveland.  Calhoun and Pacific West used means and instrumentalities of interstate

18   commerce to direct investors' funds to the Trust, to communicate with the trustee,

19   and to receive payments of Pacific West's margin from the Trust and trustee.

20        95.    The Sales Agent Defendants each emailed, telephoned and/or met in

21   person with investors and potential investors in connection with the offer and sale of

22   Pacific West life settlements.  The Sales Agent Defendants are located in California,

23   Washington, and South Carolina.

24        96.    There is no registration statement on file or in effect with the SEC for

25   the offer or sale of life settlements by Defendants.

26   **E.    Pacific West, Calhoun, and the Sales Agent Defendants Are Unregistered**

27   **     Broker-Dealers**

28        97.    Pacific West, Calhoun, and the Sales Agent Defendants are acting as

COMPLAINT                                                    23

brokers by effecting transactions in life settlements for the account of others by soliciting investors, providing investors with disclosure documents, and participating in taking investors' orders.

98.     Pacific West, Calhoun, and the Sales Agent Defendants receive transaction-based compensation from the sale of life settlements to investors. Calhoun and the Sales Agent Defendants receive 8% commission on the dollar value of the fractional interests they each sell.  The Sales Agent Defendants also receive a 2% override commission on sales of outside agents with whom they work.  Pacific West receives a percentage of all sales, which on average was 46% of the amounts raised from investors.

99.     During the period from 2004 through November 2014, Pacific West received approximately $45.9 million of the total $99.9 million raised from investors as its "margin," on the sales of life settlements.

100.     During the period from 2010 through November 2014 for which records are available, Calhoun personally received at least $7.6 million in salary, commissions, and other transfers from Pacific West.

101.     During the period from 2011 through November 2014 for which records are available, Barry received at least $681,000 in commissions from Pacific West directly and/or indirectly through her corporation BAK West.

102.     During the period from 2011 through November 2014 for which records are available, Calhoun Jr. received at least $485,000 in commissions from Pacific West.

103.     During the period from 2011 through November 2014 for which records are available, Cannon received at least $658,000 in commissions from Pacific West directly and/or indirectly through his corporation Century Point.

104.     During the period from 2011 through November 2014 for which records are available, Dotta received at least $438,000 in commissions from Pacific West.

105.     During the period from 2011 through November 2014 for which records

COMPLAINT                                         24

1  are available, Moody, doing business as Sky Stone, received at least $540,000 in

2  commissions from Pacific West.

3      106.   Pacific West is not registered with the Securities and Exchange

4  Commission as a broker or dealer.

5      107.   Calhoun, and the Sales Agent Defendants are not associated with a

6  registered broker or dealer.

7                    **FIRST CLAIM FOR RELIEF**

8      **Fraud In Connection With the Purchase or Sale of Securities**

9      **Violations of Section 10(b) of the Exchange Act**

10             **and Rule 10b-5 Thereunder**

11             **(Against Pacific West and Calhoun)**

12      108.   The SEC realleges and incorporates by reference paragraphs 1 through

13  107 above.

14      109.   The defendants, and each of them, by engaging in the conduct described

15  above, directly or indirectly, in connection with the purchase or sale of a security, by

16  the use of means or instrumentalities of interstate commerce, of the mails, or of the

17  facilities of a national securities exchange, with scienter:

18          (a)    employed devices, schemes, or artifices to defraud;

19          (b)    made untrue statements of a material fact or omitted to state a

20  material fact necessary in order to make the statements made, in the light of the

21  circumstances under which they were made, not misleading; or

22          (c)    engaged in acts, practices, or courses of business which operated

23  or would operate as a fraud or deceit upon other persons.

24      110.   By engaging in the conduct described above, the defendants violated,

25  and unless restrained and enjoined will continue to violate, Section 10(b) of the

26  Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c)

27  thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), & 240.10b-5(c).

28

COMPLAINT                        25

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a) of the Securities Act

### (Against Pacific West and Calhoun)

111. The SEC realleges and incorporates by reference paragraphs 1 through 107 above.

112. The defendants, and each of them, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:

        (a)    with scienter, employed devices, schemes, or artifices to defraud;

        (b)    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

113. By engaging in the conduct described above, all of the defendants violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

## THIRD CLAIM FOR RELIEF

### Unregistered Broker-Dealer

### Violations of Section 15(a) of the Exchange Act

### (Against Pacific West; Calhoun; Barry; BAK West, Inc.; Calhoun Jr.; Cannon; Century Point, LLC; Dotta; and Moody)

114. The Commission realleges and incorporates by reference paragraphs 1 through 107 above.

115.   Defendants Pacific West, Calhoun; Barry; BAK West, Inc.; Calhoun Jr.; Cannon; Century Point, LLC; Dotta, and Moody, by engaging in the conduct described above, used the mails and the means and instrumentalities of interstate commerce, to effect transactions in, or induct or attempt to induce the purchase or sale of securities, without registering being with the Commission as a broker.

116.   By engaging in the conduct described above, defendants violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

## FOURTH CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities in Violation of

### Section 5(a) and 5(c) of the Securities Act

### (Against All Defendants)

117.   The Commission realleges and incorporates by reference paragraphs 1 through 107 above.

118.   Defendants, by engaging in the conduct described above, directly or indirectly, and without a registration statement in effect as to such securities:

(a)   made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise; or

(b)   carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale.

119.   Defendants, by engaging in the conduct described above, also directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise securities, without a registration statement having been filed as to those securities.

120.   By engaging in the foregoing conduct, Defendants directly or indirectly,

COMPLAINT                                27

1  violated, and unless restrained and enjoined will continue to violate Sections 5(a) and
2  5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

3  ### FIFTH CLAIM FOR RELIEF
4  **Controlling Person Liability**
5  **Under Section 20(a) of the Exchange Act**
6  **(Against Calhoun)**

7  121. The Commission realleges and incorporates by reference paragraphs 1
8  through 107 above.

9  122. Alternatively, defendant Calhoun is, or was at the time the acts and
10  conduct set forth herein were committed, directly or indirectly, a person who
11  controlled Pacific West and who sold securities through fraudulent means in violation
12  of the Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a),
13  10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), &
14  240.10b-5(c).

15  123. Defendant Calhoun is, or was at the time the acts and conduct set forth
16  herein were committed, directly or indirectly, a person who controlled Pacific West
17  who effected securities transactions without being registered with the Commission as
18  a broker in violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

19  124. By engaging in the conduct described above, under Section 20(a) of the
20  Exchange Act, 15 U.S.C. § 78t(a), defendant Calhoun is jointly and severally liable
21  with, and to the same extent as, the persons they controlled for violations of Sections
22  10(b) and 15(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78o(a), and Rules 10b-
23  5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), &
24  240.10b-5(c).

25  ### PRAYER FOR RELIEF
26  WHEREFORE, the SEC respectfully requests that the Court:
27  **I.**
28  Issue findings of fact and conclusions of law that Defendants committed the

COMPLAINT                                28

1  alleged violations.

## II.

3      Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of
4  Civil Procedure, preliminarily and permanently enjoining the defendants and their
5  officers, agents, servants, employees, and attorneys, and those persons in active
6  concert or participation with any of them, who receive actual notice of the judgment
7  by personal service or otherwise, and each of them, from violating Sections 5(a) and
8  5(c), and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), and 77q(a), and
9  Sections 10(b) and 15(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78o(a), and
10  Rules 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

## III.

12      Order defendants to disgorge all ill-gotten gains from their illegal conduct,
13  together with prejudgment interest thereon.

## IV.

15      Order defendants Pacific West, Calhoun, and the Sales Agent Defendants to
16  pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and
17  Section 21(d)(3) of the Exchange Act, 15 U.S.C. 78u(d)(3).

## V.

19      Retain jurisdiction of this action in accordance with the principles of equity and
20  the Federal Rules of Civil Procedure in order to implement and carry out the terms of
21  all orders and decrees that may be entered, or to entertain any suitable application or
22  motion for additional relief within the jurisdiction of this Court.

23  *///*
24  *///*
25  *///*
26  *///*
27  *///*
28  *///*

COMPLAINT                   29

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  April 7, 2015

/s/  *John B. Bulgozdy*

John B. Bulgozdy
Kristin S. Escalante
Kelly C. Bowers
Todd Brilliant
Attorneys for Plaintiff
Securities and Exchange Commission

COMPLAINT

30

# **EXHIBIT** B

**FILED**
CLERK, U.S. DISTRICT COURT

2/16/2018

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CW _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> PACIFIC WEST CAPITAL GROUP, INC.; ANDREW B CALHOUN IV; PWCG TRUST; BRENDA CHRSTINE BARRY; BAK WEST, INC.; ANDREW B CALHOUN JR.; ERIC CHRISTOPHER CANNON; CENTURY POINT, LLC; MICHAEL WAYNE DOTTA; and CALEB AUSTIN MOODY (dba SKY STONE), <br><br> Defendants. | Case No.  2:15-cv-02563 FMO (FFMx) <br><br> **JUDGMENT AS TO DEFENDANT PWCG TRUST** <br><br> [APPOINTMENT OF RECEIVER] |

1      The Securities and Exchange Commission ("SEC") having filed a Complaint

2  and Defendant PWCG Trust having entered a general appearance; consented to the

3  Court's jurisdiction over Defendant and the subject matter of this action; consented to

4  the entry of this Judgment without admitting or denying the allegations of the

5  Complaint (except as to jurisdiction); waived findings of fact and conclusions of law;

6  and waived any right to appeal from this Judgment:

7                     **I.**

8      IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is

9  permanently restrained and enjoined from violating Section 5 of the Securities Act

10  [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable

11  exemption:

12      (a)    Unless a registration statement is in effect as to a security, making use of

13                any means or instruments of transportation or communication in

14                interstate commerce or of the mails to sell such security through the use

15                or medium of any prospectus or otherwise;

16      (b)    Unless a registration statement is in effect as to a security, carrying or

17                causing to be carried through the mails or in interstate commerce, by any

18                means or instruments of transportation, any such security for the purpose

19                of sale or for delivery after sale; or

20      (c)    Making use of any means or instruments of transportation or

21                communication in interstate commerce or of the mails to offer to sell or

22                offer to buy through the use or medium of any prospectus or otherwise

23                any security, unless a registration statement has been filed with the

24                Commission as to such security, or while the registration statement is the

25                subject of a refusal order or stop order or (prior to the effective date of

26                the registration statement) any public proceeding or examination under

27                Section 8 of the Securities Act [15 U.S.C. § 77h].

28

1    IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as

2  provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also

3  binds the following who receive actual notice of this Judgment by personal service or

4  otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and

5  (b) other persons in active concert or participation with Defendant or with anyone

6  described in (a).

7                                    **II.**

8    IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the

9  Consent is incorporated herein with the same force and effect as if fully set forth

10  herein, and that Defendant shall comply with all of the undertakings and agreements

11  set forth therein.

12                                   **III.**

13    IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that

14  Thomas A. Hebrank is appointed as permanent receiver of Defendant PWCG Trust,

15  with full powers of an equity receiver, including, but not limited to, full power over

16  all funds, assets, collateral, premises (whether owned, leased, occupied, or otherwise

17  controlled), choses in action, books, records, papers and other property belonging to,

18  being managed by or in the possession of or control of Defendant PWCG Trust, and

19  that such receiver is immediately authorized, empowered and directed:

20    A.    to have access to and to collect and take custody, control, possession,

21          and charge of all funds, assets, collateral, premises (whether owned,

22          leased, pledged as collateral, occupied, or otherwise controlled), choses

23          in action, books, records, papers and other real or personal property,

24          wherever located, of or managed by Defendant PWCG Trust

25          (collectively, the "Assets"), with full power to sue, foreclose, marshal,

26          collect, receive, and take into possession all such Assets (including

27          access to and taking custody, control, and possession of all such Assets);

28

B.    to assume full control of Defendant PWCG Trust by removing, as the receiver deems necessary or advisable, any director, officer, attorney, independent contractor, employee, or agent of any of Defendant PWCG Trust, and any named Defendant, from control of, management of, or participation in, the affairs of Defendant PWCG Trust;

C.    to have control of, and to be added as the sole authorized signatory for, all accounts of the entities in receivership, including all accounts at any bank, title company, escrow agent, financial institution or brokerage firm (including any futures commission merchant) which has possession, custody or control of any Assets, or which maintains accounts over which Defendant PWCG Trust, and/or any of its employees or agents have signatory authority;

D.    to conduct such investigation and discovery as may be necessary to locate and account for all of the assets of or managed by Defendant PWCG Trust, and to engage and employ attorneys, accountants and other persons to assist in such investigation and discovery;

E.    to take such action as is necessary and appropriate to preserve and take control of and to prevent the dissipation, concealment, or disposition of any Assets;

F.    to choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

G.    to make an accounting, as soon as practicable, to this Court and the SEC of the assets and financial condition of Defendant PWCG Trust, and to file the accounting with the Court and deliver copies thereof to all parties;

H.    to make such payments and disbursements from the Assets taken into custody, control, and possession or thereafter received by him or her, and to incur, or authorize the making of, such agreements as may be necessary and advisable in discharging his or her duties as permanent receiver;

I.    to investigate and, where appropriate, to institute, pursue, and prosecute all claims and causes of action of whatever kind and nature that may now or hereafter exist as a result of the activities of present or past employees or agents of Defendant PWCG Trust;

J.    to institute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts, which (i) the receiver deems necessary and advisable to preserve or recover any Assets, or (ii) the receiver deems necessary and advisable to carry out the receiver's mandate under this Order; and

K.    to have access to and monitor all mail, electronic mail, and video phone of the entities in receivership in order to review such mail, electronic mail, and video phone which he or she deems relates to their business and the discharging of his or her duties as permanent receiver.

**IV.**

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant PWCG Trust, and its officers, agents, servants, employees and attorneys, and any other persons who are in custody, possession or control of any assets, collateral, books, records, papers or other property of or managed by any of the entities in receivership, shall forthwith give access to and control of such property to the permanent receiver.

**V.**

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that no officer, agent, servant, employee or attorney of Defendant PWCG Trust shall take any action

1  or purport to take any action, in the name of or on behalf of Defendant PWCG Trust

2  without the written consent of the permanent receiver or order of this Court.

3                                       **VI.**

4          IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, except by

5  leave of this Court, during the pendency of this receivership, all clients, investors,

6  trust beneficiaries, note holders, creditors, claimants, lessors and all other persons or

7  entities seeking relief of any kind, in law or in equity, from Defendant PWCG Trust

8  or its Trustee, and all persons acting on behalf of any such investor, trust beneficiary,

9  note holder, creditor, claimant, lessor, consultant group or other person, including

10 sheriffs, marshals, servants, agents, employees and attorneys, are hereby enjoined

11 from, directly or indirectly, with respect to these persons and entities:

12         A.     commencing, prosecuting, continuing or enforcing any suit or

13                proceeding (other than the present action by the SEC or any other action

14                by the government) against any of them;

15         B.     using self-help or executing or issuing or causing the execution or

16                issuance of any court attachment, subpoena, replevin, execution or other

17                process for the purpose of impounding or taking possession of or

18                interfering with or creating or enforcing a lien upon any property or

19                property interests owned by or in the possession of any of them; and

20         C.     doing any act or thing whatsoever to interfere with taking control,

21                possession or management by the permanent receiver appointed

22                hereunder of the property and assets owned, controlled or managed by or

23                in the possession of any of them, or in any way to interfere with or

24                harass the permanent receiver or his or her attorneys, accountants,

25                employees, or agents or to interfere in any manner with the discharge of

26                the permanent receiver's duties and responsibilities hereunder.

27

28

## VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant PWCG Trust, and its subsidiaries, affiliates, officers, agents, servants, employees and attorneys, shall cooperate with and assist the permanent receiver and shall take no action, directly or indirectly, to hinder, obstruct, or otherwise interfere with the permanent receiver or his or her attorneys, accountants, employees or agents, in the conduct of the permanent receiver's duties or to interfere in any manner, directly or indirectly, with the custody, possession, management, or control by the permanent receiver of the funds, assets, collateral, premises, and choses in action described above.

## VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant PWCG Trust shall pay the costs, fees and expenses of the permanent receiver incurred in connection with the performance of his duties described in this Judgment, including the costs and expenses of those persons who may be engaged or employed by the permanent receiver to assist him in carrying out his duties and obligations.  All applications for costs, fees, and expenses for services rendered in connection with the receivership other than routine and necessary business expenses in conducting the receivership, such as salaries, rent, and any and all other reasonable operating expenses, shall be made by application setting forth in reasonable detail the nature of the services and shall be heard by the Court.

## IX.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that no bond shall be required in connection with the appointment of the permanent receiver. Except for an act of gross negligence, the permanent receiver shall not be liable for any loss or damage incurred by any of the defendants, their officers, agents, servants, employees and attorneys or any other person, by reason of any act performed or omitted to be performed by the permanent receiver in connection with the discharge

1  of his duties and responsibilities.

2  **X.**

3        IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court

4  shall retain jurisdiction over this action for the purpose of implementing and carrying

5  out the terms of all orders and decrees which may be entered herein and to entertain

6  any suitable application or motion for additional relief within the jurisdiction of this

7  Court.

8

9  IT IS SO ORDERED.

10

11  Dated:  <u>February 16, 2018</u>

                            /s/

12                          HON. FERNANDO M. OLGUIN

                        UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28